IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON


BARBARA E. CANTRELL,

      Plaintiff,

                                    Case 3:13-cv-00934-PK


                                    OPINION AND ORDER

v.


CAROLYN W. COLVIN
Acting Commissioner of Social Security,

      Defendant.

---

PAPAK, Magistrate Judge:

      Plaintiff Barbara E. Cantrell filed this action on June 22, 2009, seeking judicial review of the Commissioner of Social Security's decision denying her application for supplemental security income payments under Title XVI of the Social Security Act.  This court has

jurisdiction over plaintiff's action pursuant to 42 U.S.C. § 405(g). I have considered all of the parties' briefs and all of the evidence in the administrative record. For the reasons set forth below, the Commissioner's final decision is affirmed.

## DISABILITY ANALYSIS FRAMEWORK

To establish disability within the meaning of the Act, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected . . . to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Commissioner has established a five-step sequential process for determining whether a claimant has made the requisite demonstration. *See Bowen v. Yuckert*, 482 U.S. 137, 140 (1987); *see also* 20 C.F.R. 416.920(a)(4). At the first four steps of the process, the burden of proof is on the claimant; only at the fifth and final step does the burden of proof shift to the Commissioner. *See Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999).

At the first step, the Administrative Law Judge ("ALJ") considers the claimant's work activity, if any. *See Bowen*, 482 U.S. at 140; *see also* 20 C.F.R. 416.920(a)(4)(i). If the ALJ finds that the claimant is engaged in substantial gainful activity, the claimant will be found not disabled. *See Bowen*, 482 U.S. at 140; *see also* 20 C.F.R. 416.920(a)(4)(i), 416.920(b). Otherwise, the evaluation will proceed to the second step.

At the second step, the ALJ considers the medical severity of the claimant's impairments. *See Bowen*, 482 U.S. at 140-141; *see also* 20 C.F.R. 416.920(a)(4)(ii). An impairment is "severe" if it significantly limits the claimant's ability to perform basic work activities and is expected to persist for a period of twelve months or longer. *See Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. 416.920(c). The ability to perform basic work activities is defined as "the

2

abilities and aptitudes necessary to do most jobs." 20 C.F.R. 416.921(b); *see also Bowen*, 482 U.S. at 141. If the ALJ finds that the claimant's impairments are not severe or do not meet the duration requirement, the claimant will be found not disabled. *See Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. 416.920(a)(4)(ii), 416.920(c). Nevertheless, it is well established that "the step-two inquiry is a de minimis screening device to dispose of groundless claims." *Smolen v. Chater*, 80 F.3d 1273, 1290 (9th Cir. 1996), *citing Bowen*, 482. U.S. at 153-154. "An impairment or combination of impairments can be found 'not severe' only if the evidence establishes a slight abnormality that has 'no more than a minimal effect on an individual[']s ability to work." *Id.*, *quoting* SSR 85-28, 1985 WL 56856 (1985).

If the claimant's impairments are severe, the evaluation will proceed to the third step, at which the ALJ determines whether the claimant's impairments meet or equal "one of a number of listed impairments that the [Commissioner] acknowledges are so severe as to preclude substantial gainful activity." *Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. 416.920(a)(4)(iii), 416.920(d). If the claimant's impairments are equivalent to one of the impairments enumerated in 20 C.F.R. 404, subpt. P, app. 1, the claimant will conclusively be found disabled. *See Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. 416.920(a)(4)(iii), 416.920(d).

If the claimant's impairments are not equivalent to one of the enumerated impairments, between the third and the fourth steps the ALJ is required to assess the claimant's residual functional capacity ("RFC"), based on all the relevant medical and other evidence in the claimant's case record. *See* 20 C.F.R. 416.920(e). The RFC is an estimate of the claimant's capacity to perform sustained, work-related physical and/or mental activities on a regular and continuing basis,[1] despite the limitations imposed by the claimant's impairments. *See* 20 C.F.R.

---

[1] "A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." SSR 96-8p, 1996 WL 374184 (July 2, 1996).

416.945(a); *see also* SSR 96-8p, 1996 WL 374184 (July 2, 1996).

At the fourth step of the evaluation process, the ALJ considers the RFC in relation to the claimant's past relevant work. *See Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. 416.920(a)(4)(iv). If, in light of the claimant's RFC, the ALJ determines that the claimant can still perform his or her past relevant work, the claimant will be found not disabled. *See Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. 416.920(a)(4)(iv), 416.920(f).  In the event the claimant is no longer capable of performing his or her past relevant work, the evaluation will proceed to the fifth and final step, at which the burden of proof shifts, for the first time, to the Commissioner.

At the fifth step of the evaluation process, the ALJ considers the RFC in relation to the claimant's age, education, and work experience to determine whether a person with those characteristics and RFC could perform any jobs that exist in significant numbers in the national economy. *See Bowen*, 482 U.S. at 142; *see also* 20 C.F.R. 416.920(a)(4)(v), 416.920(g), 416.960(c), 416.966.  If the Commissioner meets her burden to demonstrate the existence in significant numbers in the national economy of jobs capable of being performed by a person with the RFC assessed by the ALJ between the third and fourth steps of the five-step process, the claimant is found not to be disabled. *See Bowen*, 482 U.S. at 142; *see also* 20 C.F.R. 416.920(a)(4)(v), 416.920(g), 416.960(c), 416.966.  A claimant will be found entitled to benefits if the Commissioner fails to meet that burden at the fifth step. *See Bowen*, 482 U.S. at 142; *see also* 20 C.F.R. 416.920(a)(4)(v), 416.920(g).

## LEGAL STANDARD

A reviewing court must affirm an Administrative Law Judge's decision if the ALJ applied proper legal standards and his or her findings are supported by substantial evidence in the record. *See* 42 U.S.C. § 405(g); *see also Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1193

(9th Cir. 2004). "'Substantial evidence' means more than a mere scintilla, but less than a preponderance; it is such relevant evidence as a reasonable person might accept as adequate to support a conclusion." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007), *citing Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006).

The court must review the record as a whole, "weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion." *Id.*, *quoting Reddick v. Chater*, 157 F.3d 715, 720 (9th Cir. 1998). The court may not substitute its judgment for that of the Commissioner. *See id.*, *citing Robbins*, 466 F.3d at 882; *see also Edlund v. Massanari*, 253 F.3d 1152, 1156 (9th Cir. 2001). Moreover, the court may not rely upon its own independent findings of fact in determining whether the ALJ's findings are supported by substantial evidence of record. *See Connett v. Barnhart*, 340 F.3d 871, 874 (9th Cir. 2003), *citing SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947). If the ALJ's interpretation of the evidence is rational, it is immaterial that the evidence may be "susceptible [of] more than one rational interpretation." *Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989), *citing Gallant v. Heckler*, 753 F.2d 1450, 1453 (9th Cir. 1984).

## PROCEDURAL HISTORY AND BACKGROUND

Cantrell received treatment from Karen Potampa, R.N., F.N.P., at the Mountain View Professional Center in connection with virtually all of her medical needs during the period from 2002 through 2011. During that period, Potampa recorded approximately 30 in-person and telephonic consultations with Cantrell.

Effective June 29, 2009, Cantrell protectively filed concurrent applications for disability insurance benefits ("DIB") and social security income ("SSI") under Titles II and XVI of the Act, alleging a disability onset date of January 1, 2001. (Tr. 162-175). On July 21, 2009,

Cantrell's daughter, Michelle Bushard, provided written testimony as to the manner in which

Cantrell's "illnesses, injuries, or conditions limit []her activities." (Tr. 205-212).

On October 15, 2009, Cantrell was referred to Administration consultative examiner

Nancy Maloney, M.D., for a physical disability examination. (Tr. 347-351). Dr. Maloney

performed a physical examination and reviewed Cantrell's past medical records. (Tr. 347-349).

Based on her review and examination, Dr. Maloney opined that Cantrell was capable of

occasionally lifting and/or carrying 20 pounds, frequently lifting and/or carrying ten pounds,

standing and/or walking at least two hours in an eight-hour workday, sitting for a total of less

than about six hours in an eight-hour workday but must periodically alternate sitting and

standing to relieve pain or discomfort, and unlimited pushing and/or pulling. (Tr. 350). Dr.

Maloney further opined that Cantrell was capable of occasionally balancing, stooping, kneeling,

crouching, and crawling, but was to never climb ramps, stairs, ladders, ropes, or scaffolds. (Tr.

350). Dr. Maloney additionally opined that Cantrell was capable of frequently reaching in all

directions (including overhead), handling (gross manipulation), fingering (fine manipulation),

and feeling (skin receptors), but should avoid frequent exposure to extreme cold, extreme heat,

vibration, and hazards (machinery, heights, etc.). (Tr. 351). Finally, Dr. Maloney opined that

Cantrell should avoid occasional exposure to noise and fumes, odors, dusts, gases, and poor

ventilation, but should not be restricted from wetness or humidity. (Tr. 351). Dr. Maloney

ultimately diagnosed Cantrell with fibromyalgia, diabetes mellitus, and hypothyroidism. (Tr.

351).

On December 2, 2009, Administration consultant physician Linda Jensen, M.D.,

conducted a review of Cantrell's medical records and completed an assessment of her physical

residual functional capacity (an "RFCA"), considering the period from January 1, 2003 to

December 2, 2009. (Tr. 352-359). Dr. Jensen opined that Cantrell could occasionally lift and/or

carry 20 pounds, frequently lift and/or carry ten pounds, stand and/or walk for a total of at least

two hours in an eight-hour workday, sit for a total of less than about six hours in an eight-hour

day, and was unlimited in her ability to push and/or pull. (Tr. 353). Dr. Jensen further opined

that Cantrell was capable of occasionally climbing ladders, ropes, and scaffolds, and frequently

climbing ramps and stairs, balancing, stooping, kneeling, crouching, and crawling. (Tr. 354).

Dr. Jensen further opined that Cantrell had no manipulative, visual, or communicative

limitations. Finally, Dr. Jensen opined that, while Cantrell's exposure to extreme cold and heat,

wetness, humidity, noise, and fumes, odors, gases, and poor ventilation did not need to be

limited, she should avoid concentrated exposure to vibration and hazards (machinery, heights,

etc.) due to possible adverse effects of her medications. (Tr. 356). Based on her review of

Cantrell's records, including Dr. Maloney's report, Dr. Jensen diagnosed Cantrell with the

medically determinable impairments of diabetes mellitus, fibromyalgia, and hyperthyroidism,

and found it "reasonable to assess [Cantrell] as being able to perform light RFC from [January 1,

2003] to current." (Tr. 359).

On December 4, 2009, the Administration denied Cantrell's SSI and DIB applications,

finding her not disabled for purposes of the Act.

On January 13, 2010, Cantrell met with Potampa to follow up on lab work. In the

progress note from that appointment, Potampa wrote that Cantrell had asked her to "provide her

with a letter stating that she has been diagnosed with neuropathy." (Tr. 367). Potampa opined in

that connection that Cantrell was "building a file . . . for social security disability. She has had

one in denial, but states that she is 'continuing to build a file.'" (Tr. 367).

On February 17, 2010, Cantrell filed a request for reconsideration of the Administration's

adverse decision. (Tr. 98-99). On July 12, 2010, Disability Determination Services ("DDS") referred Cantrell to psychological consultative examiner William Trueblood, Ph.D., for psychodiagnostic examination. (Tr. 402-410). Dr. Trueblood interviewed Cantrell, performed a mental status examination, and reviewed her prior medical records. Dr. Trueblood opined that "[p]sychodiagnostic examination of Barbara Cantrell yields a history that reflects long-term depression, which is consistent with diagnosis of Dysthymia," and assessed Cantrell a Global Assessment of Functioning ("GAF") score of 55. (Tr. 407, 409).

On July 22, 2010, Administration psychological consultant Sandra Lundblad, Psy.D., relied upon a Psychiatric Review Technique ("PRT") to assess Cantrell's mental residual functional capacity during the period from June 22, 2009 to July 20, 2010. (Tr. 411-424). Dr. Lundblad classified Cantrell's mental health symptoms as falling under Administration listings 12.04 (Affective Disorders) and 12.06 (Anxiety-Related Disorders). (Tr. 411). Dr. Lundblad characterized Cantrell's impairments as dysthymia under Affective Disorders, and Anxiety Disorder, NOS under Anxiety-Related Disorders (Tr. 414, 416), but determined that her dysthymia and anxiety were "Not Severe." (Tr. 411). Under a degree of limitation scale consisting of none, mild, moderate, marked, and extreme (with only the degrees marked and extreme satisfying the functional criterion), Dr. Lundblad found that, in connection with her Affective Disorder or Anxiety-Related Disorder, Cantrell had mild "restriction of activities of daily living," mild "difficulties in maintaining social functioning," mild "difficulties in maintaining concentration, persistence, or pace," and no "episodes of decompensation of an extended duration." (Tr. 421). Dr. Lundblad lastly determined that the evidence did not establish the presence of the "C" criteria in connection with either Affective Disorders or Anxiety-Related Disorders. (Tr. 422).

On July 26, 2010, Administration medical consultant Neal Berner, M.D., re-assessed Cantrell's physical residual functional capacity. After reviewing Cantrell's medical records and finding "no new or material evidence to support a change in determination," Dr. Berner affirmed Dr. Jensen's prior conclusion that Cantrell was capable of performing a light RFC. (Tr. 425). On July 29, 2010, upon reconsideration, the Administration again denied Cantrell's SSI and DIB applications, finding her not disabled for purposes of the Act. (Tr. 98-99).

On August 11, 2011, Cantrell met again with Potampa to review some lab work. (Tr. 472-474). In her progress note from that appointment, Potampa wrote that Cantrell "inquir[ed] about receiving a note of medical necessity for a cane that she uses on an a[s] needed basis [bcause] her attorney has told her that a medical order for a cane that she is using would add credibility to her case." (Tr. 472).

In or around October 2010, Cantrell went on a one-month camping and hunting trip with her family. (Tr. 83-84).

On March 17, 2011, Cantrell met with Mark Belza, M.D., at The Center for Orthopedics and Neurosurgery (the "Center"). (Tr. 432-435). Cantrell complained of low back pain and left leg pain, and Dr. Belza found "no focal tenderness" in Cantrell's spine. (Tr. 434).

On September 29, 2011, Cantrell amended her alleged disability onset date from January 1, 2001 to June 29, 2009, and withdrew her DIB claim. (Tr. 155). On November 9, 2011, a hearing in connection with Cantrell's SSI application was held before an Administrative Law Judge, at which Cantrell's attorney and a vocational expert attended. (Tr. 36-95). During the hearing, Cantrell confirmed the amendment of her alleged disability onset date and the withdrawal of her DIB claim. On December 28, 2011, the ALJ issued a decision finding Cantrell not disabled for purposes of her SSI application. (Tr. 21-30). The Appeals Council

denied Cantrell's request for review of the ALJ's decision on April 2, 2013. In consequence, the

ALJ's decision became the final decision of the Commissioner. 20 C.F.R. 404.981, 416.1481.

This action for judicial review of the Commissioner's final decision followed.

## SUMMARY OF ALJ FINDINGS

The ALJ issued a decision finding Cantrell not disabled for purposes of her application

for benefits on December 28, 2011. (Tr. 21-30). At the first step of the five-step sequential

evaluation process, the ALJ found that Cantrell had not engaged in substantial gainful activity at

any time following her amended alleged onset date of June 29, 2009. (Tr. 23). He therefore

proceeded to the second step of the analysis.

At the second step, the ALJ found that Cantrell's fibromyalgia, diabetes mellitus,

degenerative disc disease of the lower spine, and bilateral hand and finger pain were "severe

impairments" for purposes of the Act. (Tr. 24). In light of that finding, the ALJ properly

proceeded to the third step of the analysis.

At the third step, the ALJ found that none of Cantrell's impairments was the equivalent of

any of the impairments enumerated in 20 C.F.R. 404, subpt P, app. 1. (Tr. 25). The ALJ

therefore properly conducted an assessment of Cantrell's RFC. (Tr. 25-29). Specifically, the

ALJ found that during the relevant adjudication period, Cantrell had:

> [T]he residual functional capacity to perform light work as defined in 20 CFR
> 416.967(b) except that the claimant can perform postural activities occasionally,
> can never climb ladders, ropes, or scaffolds, can occasionally climb stairs, cannot
> be exposed to vibrations, cannot be exposed to extreme temperatures, cannot be
> exposed to humidity, and cannot work around heights or hazards.

(Tr. 25). In reaching this finding, the ALJ "considered all symptoms and the extent to which

these symptoms can reasonably be accepted as consistent with the objective medical evidence

and other evidence," including lay opinion evidence. (Tr. 25).

At the fourth step, the ALJ found Cantrell capable of performing her past relevant work as a self-service store attendant and a receptionist, based on his determination that these jobs did "not require the performance of work-related activities precluded by [Cantrell's] residual functional capacity." (Tr. 29, *citing* 20 C.F.R. 416.965). The ALJ reached this determination based on the vocational expert's testimony "that a hypothetical claimant with [Cantrell's] residual functional capacity and vocational profile would be able to perform [her] past relevant work" as a self-service store attendant and a receptionist. (Tr. 29).

Based on his finding that Cantrell was capable of performing some of her past relevant work, the ALJ concluded that she was not disabled for purposes of the Act at any time between June 29, 2009, and December 28, 2011. (Tr. 30). As noted above, the ALJ's decision became the Commissioner's final decision on April 2, 2013.

## ANALYSIS

Cantrell challenges the Commissioner's determination that her testimony regarding the severity of her symptoms and impairments was not credible, adoption of Dr. Lundblad's opinion and decision to accord less weight to Dr. Trueblood's opinion, adoption of Dr. Jensen's opinion and decision to accord limited weight to Dr. Maloney's opinion, determination that Cantrell's dysthymia was not a severe impairment at step two of the five-step evaluation process, and failure to fully credit a third-party lay witness statement.

## I.    The ALJ's Credibility Determination Regarding Cantrell's Testimony

Cantrell argues that the ALJ erred in determining that her testimony regarding the severity of her symptoms and impairments was not entirely credible (Pl.'s Br. 8-11, Tr. 28-29) because he "did not offer a clear and convincing reason for the rejection of [her] credibility and testimony about her impairments and their limiting effects." (Pl.'s Br. 11).

Since she filed her initial applications in 2009, Cantrell has testified about her pain and limitations on several occasions.  On July 24, 2009, Cantrell filled out a Function Report - Adult (Form SSA-3373), in which she complained of fatigue, occasional inability to sleep, chronic pain, memory problems, and vision problems.  (Tr. 221-228).  She stated that she was able to lift 20 pounds "much of the time," walk 0.25 miles on a good day before needing to rest for ten to fifteen minutes or longer, and that "squatting, bending, standing, walking, sitting, [and] kneeling [we]re very painful."  (Tr. 226).  Cantrell also stated that she could not work outside as often as formerly due to pain and tiredness, and that her vision problems made it difficult to read or sew. (Tr. 225).

In the summer of 2009, Cantrell filled out a Disability Report - Adult (Form SSA-3368), in which she stated, "I should not drive because of my vision, tired all the time, in pain all the time, there are days that I just could not do any work."  (Tr. 198).  Similarly, in an undated response to a DDS Pain & Fatigue Questionnaire, Cantrell stated that she had "aching" pain "everywhere" that was "always present," that she could only be up and active for one to two hours before she required rest, and that she usually required daily naps lasting two to four hours, although if she had a lot of company or was too active during a day, she would "need to sleep the whole next day."  (Tr. 229).

During the November 9, 2011, hearing before the ALJ (Tr. 36-95), Cantrell testified that she "can't sit or stand for very long" (Tr. 58), or not longer than approximately 30 minutes.  (Tr. 63-64).  She stated that she needs to sit in an office chair to sweep and mop, and can only do dishes standing for fifteen minutes before needing to rest due to leg and back pain.  (Tr. 70-71).

If a claimant provides objective medical evidence of an underlying impairment that could reasonably be expected to produce the symptoms alleged and no affirmative evidence of

malingering exists, "the ALJ can reject the claimant's testimony about the severity of . . .

symptoms only by offering specific, clear and convincing reasons for doing so." *Smolen v.*

*Chater*, 80 F.3d 1273, 1281 (9th Cir. 1996); *see also Carmickle v. Comm'r, Soc. Sec. Admin.,*

533 F.3d 1155, 1160 (9th Cir. 2008); *Cotton v. Bowen*, 799 F.2d 1403, 1407 (9th Cir. 1986);

SSR 96-7p, 1996 WL 374186 (July 2, 1996). A general assertion that the claimant is not

credible is insufficient to meet this burden; the ALJ must "state which . . . testimony is not

credible and what evidence suggests the complaints are not credible." *Dodrill v. Shalala*, 12

F.3d 915, 918 (9th Cir. 1993). The reasons proffered must be "sufficiently specific to permit the

reviewing court to conclude that the ALJ did not arbitrarily discredit the claimant's testimony."

*Orteza v. Shalala*, 50 F.3d 748, 750 (9th Cir. 1995) (citation omitted). If, however, the "ALJ's

credibility finding is supported by substantial evidence in the record, [the court] may not engage

in second-guessing." *Thomas v. Barnhart*, 278 F.3d 947, 959 (9th Cir. 2002) (citation omitted).

In making a credibility determination, the ALJ should consider objective medical evidence, the

claimant's treatment history, daily activities, and work record, and the observations of treating

sources and third parties with personal knowledge of the claimant's functional limitations. *See*

20 C.F.R. 404.1529; *see also Tommasetti v. Astrue*, 533 F.3d 1035, 1039 (9th Cir. 2008);

*Smolen*, 80 F.3d at 1284; SSR 96-7p.

## A.    Evidence of File-Building

In support of his determination that Cantrell's testimony regarding the severity of her

symptoms and impairments was not credible, the ALJ relied in part on the foredescribed

evidence of Cantrell's requests for written medical notes or prescriptions from Potampa. On

January 13, 2010, Potampa recorded a note indicating that Cantrell's request for a letter stating

that she had been diagnosed with neuropathy as motivated by her desire to "build a file," and on

August 11, 2011, Potampa recorded a note indicating that Cantrell requested a "note of medical necessity" for a cane she already used on an as-needed basis because "her attorney has told her that a medical order for a cane that she is using would add credibility to her case." (Tr. 367, Tr. 472). The ALJ interpreted Cantrell's requests as improper attempts to bolster her case as she prepared to re-apply for Social Security benefits.

The ALJ opined that Cantrell's apparent "preoccupation with building a file for Social Security tend[ed] to point to a motivation of secondary gain." (Tr. 28, 28-29, *citing* Tr. 367-368). Similarly, the ALJ opined, in light of Potampa's observation that, notwithstanding her request for a note of medical necessity, Cantrell was "[w]alking without aid [and] [ro]se[] and walk[ed] with fluidity," (Tr. 472), Cantrell's request and the involvement of her attorney in her efforts to obtain medical care "tend[ed] to confirm [Cantrell's] strong desire to build a file for the purposes of obtaining Social Security disability benefits." (Tr. 29).

Cantrell argues that the ALJ erred in so opining. (Pl.'s Br. 8). While she "[a]dmittedly . . . wanted to win her disability case," she contends that "[i]t was erroneous for the ALJ to reject her credibility on the ground that she wanted to have the best possible case that she could. This desire [wa]s in no way inconsistent with disability nor d[id] it conflict with her testimony." (Pl.'s Br. 9). Cantrell further argues that the ALJ erroneously "rejected [her] credibility on the ground that she sought a note of 'medical necessity for a cane.'" (Pl.'s Br. 9). Cantrell defended her note of medical necessity request and its lack of bearing on her credibility, explaining:

> She had previously purchased a cane and used it periodically for stability. The ALJ did not undermine this periodic need to use the cane for stability. He undermined [Cantrell's] credibility because she sought to get a prescription for a cane which she already had and needed. This is akin to his rejection of [Cantrell's] credibility on the ground that she wanted to have the strongest possible disability case. This desire, again, to have the strongest possible disability case is consistent with disability and does not conflict with her other testimony.

(Pl.'s Br. 9).

The ALJ's interpretation of Cantrell's requests was rational and supported by specific

reasons grounded in substantial evidence of record.  The fact that an alternative, equally rational

interpretation could have been asserted does not imply that the ALJ failed to meet his burden to

support his credibility determination.  *See Batson*, 359 F.3d at 1198 (court must uphold an ALJ's

rational interpretation of the evidence).  In consequence, Cantrell's requests for medical

documentation for the purpose of bolstering her application for benefits provide a legitimate

basis for the ALJ's determination regarding her credibility.

### B.    Activities and Conduct

In further support of his assessment of Cantrell's credibility, the ALJ relied on evidence

of record suggesting inconsistencies between Cantrell's alleged limitations and both her reported

daily activities and her one-month hunting trip of October 2010.  As detailed above, Cantrell

testified that she cannot sit or stand for more than thirty minutes, can perform various household

chores only if she takes rest breaks, usually every fifteen to thirty minutes, has poor vision that

limits her ability to drive, read, and sew, experiences fatigue that requires daily naps of two to

four hours, suffers from pain "everywhere" that was "always present," and is "tired all the time

[and] in pain all the time."  Cantrell reported that on a daily basis she cooked multiple meals for

herself and her housemate, and cleaned their three-bedroom, two-bathroom house, which

generally meant vacuuming, wiping down counters, doing dishes in fifteen-minute increments,

sweeping and mopping in an office chair, and yard work.  All of these activities were reportedly

limited by Cantrell's need to rest, the frequency and regularity of which depended on how she

was feeling on a particular day.  (Tr. 221-228).  Along with these household chores, Cantrell

reported that she enjoyed playing with her grandchildren, sewing, reading, working in her yard,

Page 15 - OPINION AND ORDER            15

and watching television, though she stated her ability to enjoy these activities was limited by her pain and visual impairment. (Tr. 221-228).

Based on Cantrell's daily activities, the ALJ determined that Cantrell's "fairly normal activities of daily living [were] not consistent with allegations of debility." (Tr. 29). Cantrell argues that "[t]he ALJ erroneously relied upon [her daily] activities to reject her credibility." (Pl.'s Br. 9). While she does not deny actually performing these activities and chores, Cantrell disputes the ALJ's characterization of them, contending that "the ALJ did not address the limited nature of [her] daily activities or whether such activities were transferable to the work place. He ignored the qualifying evidence which was not in dispute that she had to lie down between tasks and could only perform tasks for short periods" of time. (Pl.'s Br. 10). Cantrell argues that, had the ALJ considered "the unrefuted testimony that chores were performed sporadically and were punctuated by periods of recumbency," her daily activities would not have been proper evidence for challenging her credibility. (Pl.'s Br. 10).

Inconsistencies in a claimant's testimony, including those between daily activities and the alleged symptoms, can serve as a basis for discrediting it. *See Burch v. Barnhart*, 400 F.3d 676, 680 (9th Cir. 2005); *see also Tommasetti*, 533 F.3d at 1040; *Molina v. Astrue*, 674 F.3d 1104, 1113 (9th Cir. 2012) (ALJ may discredit a claimant's testimony when he reports activities of daily living that "indicat[e] capacities that are transferable to a work setting" or "contradict claims of a totally debilitating impairment") (citations omitted).

In *Morgan v. Comm'r of Soc. Sec. Admin.*, the ALJ found that the claimant's "ability to fix meals, do laundry, work in the yard, and occasionally care for his friend's child" was evidence of his ability to work. 169 F.3d 595, 600 (9th Cir.1999). The Ninth Circuit explained:

> If a claimant is able to spend a substantial part of his day engaged in pursuits involving the performance of physical functions that are transferable to a work

> setting, a specific finding as to this fact may be sufficient to discredit a claimant's
> allegations. . . . [T]he ALJ, in noting Morgan's daily activities, pointed to the
> contradictions between Morgan's reported activities and his asserted limitations as
> an issue of credibility.

*Id.*, *citing Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989). On that basis, the Ninth Circuit

found that "the ALJ provided specific and substantial reasons that undermined Morgan's

credibility." *Id.*

Here, the ALJ simply listed a number of Cantrell's daily chores and hobbies,

characterizing them as "fairly normal," and concluded that they "are not consistent with

allegations of debility." (Tr. 29). The ALJ did not analyze or discuss how Cantrell's daily

activities might be transferable to a work setting or point out any specific contradictions between

Cantrell's reported activities and her asserted limitations. In the absence of any such analysis or

discussion, the ALJ did not meet his burden in discounting Cantrell's credibility based on

inconsistencies between her alleged limitations and her daily activities. I discuss the import and

consequences of the ALJ's failure below, in Section I(D), *infra*.

The ALJ noted that, in connection with her month-long camping and deer-hunting trip of

October 2010, that Cantrell "testified that she slept on a cot in a tent in the bushes, drove to the

camping area, and walked 50 yards to the creek to gather rocks." (Tr. 29). The ALJ found that

"[t]hese activities tend to cast doubt on [Cantrell's] allegation of debility." (Tr. 29). Cantrell

argues that the ALJ "erred by rejecting [her] credibility on the ground that she went camping."

(Pl.'s Br. 9-10).

In *Tommasetti*, "the ALJ doubted Tommasetti's testimony about the extent of his pain and

limitations based on his ability to travel to Venezuela for an extended time to care for an ailing

sister." 533 F.3d at 1040. The Ninth Circuit determined that, although Tommasetti "had to see a

physician for exacerbation of his back pain while in Venezuela," "the ALJ "properly infer[red]

from this fact that Tommasetti was not as physically limited as he purported to be," and, as a result, "[t]he ALJ's reasons for discounting Tommasetti's testimony [were] supported by substantial evidence in the record." *Id.* at 1040, 1040 n. 3.

Here, as in *Tommasetti*, the ALJ determined that Cantrell's ability to take a one-month deer hunting and camping trip was not consistent with her allegations of debility. (Tr. 29). The ALJ's finding was both rational and supported by substantial evidence. In consequence, evidence of Cantrell's camping trip provides a legitimate basis for the ALJ's credibility determination.

### C.    Inconsistent Allegations

In support of his assessment of Cantrell's credibility, the ALJ relied in further part inconsistencies in Cantrell's testimony regarding the severity and extent of her pain and impairment. The ALJ specifically found that, although Cantrell "complained of difficulty with communication and focus . . . she testified at the hearing cogently, relevantly, and without undue delay." (Tr. 29). Cantrell argues that the ALJ "erroneously rejected her testimony about her focus and concentration problems based on his expert assessment that she was cogent, relevant and timely during the hearing." (Pl.'s Br. 10).

The Ninth Circuit has held that an ALJ's reliance on personal observations does not render a decision based in part on those observations improper. *Sellard v. Shalala*, No. 93-35626, 1994 WL 551505, at *3 (9th Cir. Oct. 6, 1994), *citing Nyman v. Heckler*, 779 F.2d 528, 531 (9th Cir.1985). ("Although it would have been an error for the ALJ to base his decision that Sellard is capable of performing other work *solely* on observations made of Sellard at the hearing, *Perminter v. Heckler*, 765 F.2d 870, 872 (9th Cir. 1985), it was not error for the ALJ to base its decision *partially* on observations made of Sellard at the hearing." *Id.* (emphasis

original)). Here, as in *Sellard*, the ALJ's partial reliance on personal observation provides no grounds for disturbing the Commissioner's final decision.

The ALJ further noted that Cantrell "complained of *pain everywhere that was always present*." (Tr. 29, *citing* Tr. 229) (emphasis added). The ALJ found Cantrell's assertion that she suffered from ubiquitous, unrelenting pain "to be an overstatement in light of the evidence that she did not have focal tenderness of the spine," referencing the report from Cantrell's March 17, 2011, appointment with Dr. Belza. (Tr. 29, *citing* Tr. 432-435).

Cantrell argues that, when she complained of pain "everywhere" (Tr. 229), while she admittedly did not have "pain over every square inch of her body," it was clearly "not what she intended to convey by indicating that she had pain 'everywhere.'" (Pl.'s Br. 10). Cantrell essentially argues that the ALJ's interpretation of the plain language of her testimony was overly literal to the point of error.

An "ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and for resolving ambiguities. The ALJ's findings, however, must be supported by specific, cogent reasons." *Reddick*, 157 F.3d at 722, *citing Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995); *Rashad v. Sullivan*, 903 F.2d 1229, 1231 (9th Cir. 1990). "Under the *Cotton* test, a claimant who alleges disability based on subjective symptoms 'must produce objective medical evidence of an underlying impairment 'which could reasonably be expected to produce the pain or other symptoms alleged.'" *Smolen*, 80 F.3d at 1281-1282, *quoting Bunnell v. Sullivan*, 947 F.2d 341, 344 (9th Cir. 1991), *citing Cotton*, 799 F.2d at 1407-1409. If there is no "affirmative evidence showing that the claimant is malingering, the ALJ's reasons for rejecting pain testimony must be clear and convincing. The ALJ must specify what testimony is not credible and identify the evidence that undermines the claimant's complaints - '[g]eneral

findings are insufficient.'" *Burch*, 400 F.3d at 680, *citing Lester v. Chater*, 81 F.3d 821, 834 (9th Cir.1995), *quoting Reddick*, 157 F.3d at 722.

The reasons given by the ALJ for finding Cantrell's testimony inconsistent regarding the extent and severity of her pain symptoms are clear and convincing. The ALJ specified what testimony was inconsistent and clearly identified the evidence that undermined Cantrell's complaints. Furthermore, Cantrell admits that her pain testimony was inconsistent with her actual pain symptoms, explaining that "[i]t cannot be argued that . . . [she] has had constant pain over every square inch of her body." (Pl.'s Br. 10). Cantrell tried to clarify that "she was attempting to convey that the pain [was] widespread and not that her entire body from the soles of her feet to the top of her head and everything in between hurt all the time." (Pl.'s Br. 11). Nevertheless, Cantrell's statement was clearly inaccurate, and yet was offered as an accurate statement of her limitations in support of her application for benefits. Because the ALJ's interpretation of the inconsistencies between her statement and the medical evidence of record was reasonable and supported by substantial evidence of record, his reliance on those inconsistencies in support of his credibility determination was legitimate.

### D.     Substantial Evidence Supporting Specific Reasons Adduced in Connection with the ALJ's Credibility Determination

The ALJ offered five discrete reasons for determining that Cantrell's testimony regarding the severity of her symptoms and impairments was not credible. As discussed above, of the ALJ's five proffered reasons, only one was inadequately specific and inadequately supported by evidence of record to constitute proper support for his ultimate credibility determination: his reliance on purported inconsistencies between Cantrell's reported daily activities and asserted limitations. The ALJ's error in relying on those purported inconsistencies does not, however, constitute grounds for disturbing the ALJ's adverse credibility determination.

The ALJ's adverse credibility determination may be upheld even if not all of the ALJ's reasons for rejecting the claimant's testimony are upheld. *Batson*, 359 F.3d at 1197; *Coleman v. Astrue*, No. 10-35286, 2011 WL 1058448, at *1 (9th Cir. Mar. 24, 2011) (although court found error in one credibility finding, substantial evidence remained to support the ALJ's conclusions on credibility, including claimant's failure to follow repeated medical recommendations that she treat her pain with exercise and increased activity levels). As the Ninth Circuit explained:

> Our decision in *Batson* makes clear that reviewing the ALJ's credibility determination *where the ALJ provides specific reasons supporting such* is a substantive analysis. So long as there remains "substantial evidence supporting the ALJ's conclusions on . . . credibility" and the error "does not negate the validity of the ALJ's ultimate [credibility] conclusion," such is deemed harmless and does not warrant reversal. [*Batson*, 359 F.3d] at 1197; *see also Stout*, 454 F.3d at 1055 (defining harmless error as such error that is "inconsequential to the ultimate nondisability determination").

*Carmickle*, 533 F.3d at 1162 (emphasis original). Here, as in *Carmickle* and *Batson*, the ALJ's error in relying on purported but inadequately specified and supported inconsistencies between Cantrell's reported daily activities and asserted limitations does not negate the ALJ's credibility determination, which is otherwise supported by a significant corpus of substantial evidence of record. No grounds therefore exist for disturbing the ALJ's credibility determination and, in consequence, Cantrell's assignment of error in that determination provides no grounds for disturbing the Commissioner's final decision.

## II.    Medical Opinions

Cantrell argues that the ALJ erred in purportedly rejecting examining physician Dr. Trueblood's opinion that Cantrell had "severe" dysthymia and a GAF of 55 in favor of reviewing physician Dr. Lundblad's opinion that Cantrell's dysthymia was not severe (and, in consequence, in failing to find that Cantrell's dysthymia was "severe" at step two of the five-step sequential

process), and in rejecting examining physician Dr. Maloney's opinion that Cantrell could only

perform sedentary work in favor of reviewing physician Dr. Jensen's contrary opinion that she

could perform a range of light work. For purposes of the Act, distinction is made among the

medical opinions of treating, examining, and reviewing or consulting physicians. *See Lester*, 81

F.3d at 830. It is well established that, in connection with an application for Social Security

benefits, "a treating physician's opinion carries more weight than an examining physician's, and

an examining physician's opinion carries more weight than a reviewing physician's." *Holohan v.*

*Massanari*, 246 F.3d 1195, 1202 (9th Cir. 2001). To reject the uncontroverted opinion of a

treating or examining physician, the ALJ must present clear and convincing reasons for doing so.

*Bayliss v. Barnhart*, 427 F.3d 1211, 1216 (9th Cir. 2005), *citing Lester*, 81 F.3d at 830-831. If a

treating or examining physician's opinion is in conflict with substantial medical evidence or with

another physician's opinion, however, it may be rejected by specific and legitimate reasons. *Id.*

Moreover,

> Reports of consultative physicians . . . may serve as substantial evidence. . . . *A*
> *fortiori*, when it is an **examining** physician's opinion that the ALJ has rejected in
> reliance on the testimony of a nonexamining advisor, reports of the nonexamining
> advisor need not be discounted and may serve as substantial evidence when they
> are supported by other evidence in the record and are consistent with it.

*Andrews*, 53 F.3d at 1041 (emphasis original).

## A.     Opinions of Drs. Trueblood and Lundblad

As noted above, Cantrell met with examining physician Dr. Trueblood for

psychodiagnostic examination on July 12, 2010. Cantrell complained of fibromyalgia, memory

problems, "instability," and "some emotional distress and depression." (Tr. 403). She reported

experiencing depression over the years, "having strong feelings of worthlessness and guilt," but

also "obtaining pleasure, especially related to her grandchildren who are 'awesome.'" (Tr. 403-

404).

Dr. Trueblood observed that, during the examination, Cantrell's "affect was appropriate. There was no obvious sadness or anxiety." (Tr. 407). "There were no evident disturbances in attention, including that [she] was not distractible, she did not appear to lose her train of thought at any point, and she was not tangential in expressing herself. No unusual fatigue was observed." (Tr. 407).

After examination, analysis, and review, Dr. Trueblood concluded:

Psychodiagnostic examination of Barbara Cantrell yields a history that reflects long-term depression, which is consistent with diagnosis of Dysthymia. Current status does not appear to involve symptoms that meet the criteria for diagnosis of a Major Depressive Episode. The patient does report experiencing pleasure and she denies having thoughts of suicide. The patient does appear to experience some anxiety, such as in crowded stores, although she does also go into such stores by herself. She has mild anxiety in cars. She very infrequently takes medication for the anxiety. It appears fairly clear that the anxiety is mild in degree overall, and the patient says this is significantly improved compared to the past. Mild Generalized Social Phobia might be the closest diagnosis. Another diagnostic consideration is Posttraumatic Stress Disorder (PTSD) based on history of trauma that would plausibly cause PTSD. However, it does not appear that the patient experiences symptoms that fulfill the criteria for diagnosis of PTSD; in particular, this includes that she does not appear to experience symptoms that involve re-experiencing the trauma such as via nightmares or intrusive recollections. I do not identify bases to diagnose any personality disorder but there may be a long-term low social inclination that could be diagnosed as mild avoidant or schizoid personality characteristics. I did consider whether diagnosis of Attention Deficit Hyperactivity Disorder may be appropriate but overall did not identify significant evidence for this diagnosis.

(Tr. 407). Dr. Trueblood ultimately diagnosed Cantrell with dysthymia, anxiety disorder NOS-rule out mild generalized social phobia, cognitive disorder NOS-provisional diagnosis, and a GAF score of 55. (Tr. 409). I take judicial notice that the *Diagnostic & Statistical Manual of Mental Disorders*, characterizes a GAF score of 55 as reflecting "Moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social,

occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)."[2]

On July 22, 2010, twelve days after Dr. Trueblood's examination, reviewing physician Dr. Lundblad reviewed Cantrell's medical records and completed a PRT. (Tr. 411-424). Dr. Lundblad opined that Cantrell suffered from both dysthymia and anxiety disorder, NOS, falling under listings 12.04 (Affective Disorders) and 12.06 (Anxiety-Related Disorders), expressly determining that each such impairment was "Not Severe." (Tr. 411, 414, 416). Cantrell takes the position that Dr. Lundblad's diagnosis is inconsistent with Dr. Trueblood's, and that the ALJ failed to meet his burden for purportedly rejecting Dr. Trueblood's opinion.

The primary flaw in Cantrell's argument stems from her fundamental mischaracterization of Dr. Trueblood's opinion. Notwithstanding Cantrell's assertions to the contrary, analysis of the evidentiary record establishes that Dr. Trueblood did not expressly diagnose her with severe dysthymia, and that although he opined that Cantrell might suffer from mild anxiety or social phobia, he expressly further opined that her symptoms did not "meet the criteria for diagnosis of a Major Depressive Episode" (Tr. 407). Moreover, although Cantrell infers from the GAF score of 55 that Dr. Trueblood assigned her that he intended "severe" dysthymia when he made his diagnosis, in fact, as noted above, a GAF score of 55 indicates the presence of only moderate symptoms. Dr. Trueblood's opinion and diagnosis therefore do not provide support for Cantrell's contention that the ALJ erred in adopting Dr. Lundblad's opinion.

In addition, the ALJ did not err in his partial rejection of Dr. Trueblood's opinion. After reviewing the findings of Dr. Trueblood and Dr. Lundblad and "the entire evidence of record, including [Cantrell's] presentation and demeanor at the hearing," the ALJ expressly adopted Dr. Lundblad's opinion and gave "less weight" to Dr. Trueblood's opinion, based on the ALJ's finding that Cantrell's "many fairly normal activities of daily living are not consistent with a

[2] Am. Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders* 34 (4th ed. 2000).

24

Global Assessment of Functioning of 55." (Tr. 24). This constitutes a specific and legitimate

reason, supported by substantial evidence in the record, for the ALJ's determination.

Finally, because the ALJ did not err in adopting Dr. Lundblad's opinion that Cantrell's

dysthymia was not "severe" for purposes of the Act, it necessarily follows that the ALJ did not

err in so finding at step two of the five-step sequential process. In this connection, I note that

notwithstanding his step-two finding that Cantrell's dysthymia was not severe, the ALJ properly

and appropriately considered Cantrell's dysthymic symptoms in assessing her mental RFC. (*See*

Tr. 24-26, 307-346, 360-380, 402-410, 411-424, 425).

### C.    Opinions of Drs. Maloney and Jensen

As noted above, on October 15, 2009, Cantrell met with Dr. Maloney for a physical

disability examination. After making findings as to Cantrell's exertional, postural, manipulative,

and environmental limitations, Dr. Maloney diagnosed Cantrell with fibromyalgia, diabetes

mellitus, and hypothyroidism. (Tr. 351). Based on these findings, the ALJ concluded, "Dr.

Maloney opined that [Cantrell] could perform a range of sedentary work." (Tr. 28).

On December 2, 2009, Dr. Jensen conducted a review of Cantrell's medical records and

completed an assessment of Cantrell's physical RFC. (Tr. 352-359). After making findings as to

Cantrell's exertional, postural, manipulative, visual, communicative, and environmental

limitations, Dr. Jensen also diagnosed Cantrell with fibromyalgia, diabetes mellitus, and

hypothyroidism. (Tr. 359). But, unlike Dr. Maloney, Dr. Jensen found Cantrell capable of

performing a range of light work. (Tr. 28, 359).

There were a number of differences between the limitations found by Dr. Maloney and

Dr. Jensen. As Dr. Jensen explained:

> Dr. Maloney assessed [Cantrell] as being able to lift/carry 20 [pounds]
> occ[asionally]; 10 [pounds] freq[uently]; stand/walk 2/8hrs; sit 6/8hrs but must

periodically alternate sitting and standing to relieve pain or discomfort; never
climb and occ[asionally] on all other postural; freq[uently] on all manipulatives
and avoid concentrated exposure [to] extreme cold and heat, vibration, and
hazards and avoid occasional exposure to noise and fumes.

(Tr. 358). In reaching her own opinion as to Cantrell's limitations, Dr. Jensen expressly rejected

Dr. Maloney's opinion on the asserted grounds that Dr. Maloney's conclusions "do[] not reflect

the objective findings in file or [Dr. Maloney's] own exam." (Tr. 358).

The ALJ expressly adopted Dr. Jensen's opinion because it was "consistent with the

overall evidence." (Tr. 28). In adopting Dr. Jensen's opinion and ultimate conclusion that

Cantrell could perform a range of light work, the ALJ accorded limited weight to Dr. Maloney's

opinion, citing Dr. Jensen's critique of Dr. Maloney's conclusions. (Tr. 358). The ALJ further

accorded limited weight to Dr. Maloney's opinion "because she did not have evidence postdating

her one-time evaluation. In particular, [Cantrell's] ability to go on a one-month hunting trip,

[Cantrell's] various activities of daily living, and [Cantrell's] ability to sit comfortably and walk

fluidly are not consistent with a limitation to sedentary work." (Tr. 28, *citing* Tr. 402-410, 472,

489-491). Finally, the ALJ noted in support of his determination that on July 26, 2010, Dr. Neal

E. Berner, M.D., performed a further review of Cantrell's medical records and expressly affirmed

Dr. Jensen's conclusion because there was "no new or material evidence to support a change in

determination." (Tr. 425). The ALJ's reasons for adopting Dr. Jensen's opinion and for

affording limited weight to the opinion of Dr. Maloney are specific and legitimate, and

supported by substantial evidence of record. In consequence, the ALJ's treatment of the opinions

of Drs. Maloney and Jensen provide no grounds for disturbing the Commissioner's final

decision.

III.   **Lay Witness Testimony**

On July 21, 2009, as noted above, Cantrell's daughter Bushard submitted written testimony in support of Cantrell's application, indicating that Cantrell sometimes needs to be reminded to take medication, eat at lunch time, and pay bills. (Tr. 206-208). She testified that Cantrell prepares meals every day, the extent of which depend "on what she feels like that day," but that she does not make as many large meals as she used to because she tires quickly. (Tr. 207). Bushard testified that Cantrell did laundry, dishes, sweeping, mopping, and yard work, but that these chores often take her longer to complete because she requires rest. (Tr. 207). Bushard stated that Cantrell enjoys watching television, yard work, reading, sewing, and playing with her grandchildren although she can generally only do yard work every other day, cannot read or sew as much as she used to, and cannot play with her grandchildren like she used to. (Tr. 207). Bushard stated that Cantrell has no problem getting along with other people, and that Cantrell's social activity has not changed due to her impairments. (Tr. 207). Lastly, Bushard stated that Cantrell could only lift 20-25 pounds, experiences pain when squatting, kneeling, standing for too long, and climbing stairs, can only walk 0.25 to 0.5 miles before needing to rest, and has poor vision and short term memory. (Tr. 210).

An ALJ must consider the statements of non-medical sources in a position to observe a claimant's symptoms and daily activities. *Bruce v. Astrue*, 557 F.3d 1113, 1116 (9th Cir. 2009); *Stout v. Comm'r, Soc. Sec. Admin.*, 454 F.3d 1050, 1053 (9th Cir. 2006). Such lay witnesses are competent to testify regarding the claimant's condition. *Dodrill*, 12 F.3d at 918. Lay testimony as to the claimant's symptoms or how an impairment affects the ability to work cannot be disregarded without comment. *Nguyen v. Chater*, 100 F.3d 1462, 1467 (9th Cir. 1996). If the

ALJ wishes to discount lay witness testimony, he must give reasons that are germane to the witness. *Id.*; *Bayliss*, 427 F.2d at 1218; *Lewis v. Apfel*, 236 F.3d 503, 511 (9th Cir. 2001).

Notwithstanding Cantrell's assertion that the ALJ rejected Bushard's testimony, the ALJ expressly opined that "Bushard's statement regarding [Cantrell's] activities of daily living is not inconsistent" with his assessment of Cantrell's residual functional capacity. (Tr. 29). Moreover, analysis of Bushard's testimony and of the ALJ's assessment of Cantrell's RFC establishes that the ALJ's determination was correct: there is no material conflict between the limitations to which Bushard testifies and the limitations set forth in Cantrell's limited light RFC assessment. Indeed, Cantrell does not identify with particularity any such conflict or even offer argument that any such conflict is present. In the absence of any such conflict, Bushard's lay testimony provides no grounds for disturbing the Commissioner's final decision.

## CONCLUSION

For the foregoing reasons, the Commissioner's final decision is affirmed. A final judgment shall be prepared.

Dated this 10th day of September, 2014

Honorable Paul Papak
United States Magistrate Judge

28